SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MADISON PROJECT, *et al.* | |
| Plaintiffs, | Civil Action No. 1:17-cv-0597-APM |
| v. | |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

### (U) **THIRD DECLARATION OF DAVID M. HARDY**

(U) I, David M. Hardy, declare as follows:

(1)     (U) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.[1] I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     (U) In my official capacity as Section Chief of RIDS, I supervise approximately

---

[1] (U) IMD was formerly known as the Records Management Division, or RMD.

1

Classified By: ████████████
Derived From: Multiple Sources
Declassify On: 20431231

SECRET//NOFORN

SECRET//NOFORN

242 employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     (U) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of plaintiffs James Madison Project ("JMP") and Brad Heath's FOIA request for three categories of records concerning surveillance under the Foreign Intelligence Surveillance Act of 1978 ("FISA"), which is at issue in this litigation. In response to this request, the FBI issued a so-called Glomar response, whereby it neither confirmed nor denied the existence or non-existence of responsive records. Due to intervening events, the FBI pierced that Glomar response in a limited fashion, acknowledged the existence of four FISA

2

SECRET//NOFORN

applications and resulting orders regarding Carter Page, and processed those four packages for release. The FBI retained its Glomar response as to the existence or non-existence of any other responsive records.

(4)    (U)  The FBI processed 598 pages, which is the totality of the four Page FISA applications and orders; released five pages in whole and 407 in part, with information redacted pursuant to FOIA exemptions; and withheld 186 pages in full pursuant to FOIA exemptions. The FBI relied on the following FOIA exemptions in redacting information or withholding pages:  FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). *See* 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), and (b)(7)(A), (C)-(E).

(5)    (U)  This declaration is being submitted in support of DOJ's motion for summary judgment on the partial Glomar response and on the processing of plaintiffs' FOIA request.  It supplements and incorporates by reference my previous two declarations in this case.  *See* ECF No. 13-3, Declaration of David M. Hardy (hereafter "First Hardy Decl."), submitted in support of DOJ's withdrawn motion for summary judgment (ECF No. 13); ECF No. 34-1, Second Declaration of David M. Hardy (hereafter "Second Hardy Decl."), submitted in support of the DOJ's Joint Status Report (ECF No. 34).

## (U) **ADMINISTRATIVE HISTORY**

(6)    (U)  Plaintiffs submitted a FOIA request to the FBI dated March 6, 2017, requesting:

> 1. Any orders by the FISC authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for presidency, or people associated with President Trump.
>
> 2. Any applications to the FISC seeking authorization for surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for presidency, or people associated with

3

SECRET//NOFORN

SECRET//NOFORN

President Trump.

3. Any minimization procedures issued by the FISC and that applied to any orders issued that fall within the scope of #1 or #2.

*See* **ECF No. 13-3, First Hardy Decl., at ¶ 5; ECF No. 14, Exhibits to First Hardy Decl., Exhibit A.**

(7)    (U)    On April 4, 2017, the FBI responded to plaintiffs' request by issuing a Glomar response and refusing to confirm or deny the existence of responsive records based on FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).    *See* **ECF No. 13-3, First Hardy Decl., at ¶ 11; ECF No. 14, Exhibits to First Hardy Decl., Exhibit D.**

(8)    (U)    That same day, April 4, 2017, plaintiffs filed their complaint in this case. *See* **ECF No. 1, Complaint; ECF No. 13-3, First Hardy Decl., at ¶ 12.**

(9)    (U)    On April 15, 2017, plaintiffs filed their amended complaint. *See* **ECF No. 5, First Amended Complaint; ECF No. 13-3, First Hardy Decl., at ¶ 13.**

(10)    (U)    As described above, due to events occurring after this lawsuit was filed, the FBI pierced its Glomar response in a limited fashion and processed four FISA applications and FISC orders related to Carter Page.  On July 20, 2018, the FBI released all reasonably segregable, non-exempt portions of those FISA materials and published them on the FBI's electronic FOIA reading room at https://vault.fbi.gov/d1-release/d1-release/view. **(*See also* Exhibit A attached hereto.)**

### (U) **CARTER PAGE FISA APPLICATIONS AND FISC ORDERS**

#### (U) BACKGROUND

(11)    (U)    The Foreign Intelligence Surveillance Act of 1978, or FISA, establishes procedures for the physical search, electronic surveillance, and collection of "foreign intelligence

SECRET//NOFORN

information" between "foreign powers" and "agents of foreign powers" suspected of espionage

or terrorism. 50 U.S.C. § 1801(b). The statute also created the FISC to oversee requests for

surveillance warrants by federal law enforcement and intelligence agencies.

(12)    (U) The FISC meets in secret, and approves or denies requests for search

warrants. Proceedings before the FISC are generally *ex parte* and non-adversarial. *But see* 50

U.S.C. § 1803(i)(2)(A). The court hears evidence presented solely by DOJ, and unlike most

opinions rendered by other Federal courts, there is no provision for the publication or release of

FISC opinions or other information regarding FISC hearings.[2]

(13)    (U) FISA is, itself, an intelligence method and details of its use are classified, and

prohibited from disclosure under the National Security Act of 1947, 50 U.S.C. §

3024(i)(1). Specifically, the identity of a target of a FISA application/warrant is a classified fact,

as are the dates of FISA authorized surveillance, the types and locations of authorized

surveillance methods and tools, and other details about the authorized surveillance. Accordingly,

FISA applications previously have never been disclosed publicly, including under the FOIA or

through IC transparency efforts. The disclosure of the four Carter Page FISA applications is

unprecedented.

(14)    (U) In July 2016, the FBI opened an investigation of "the Russian government's

efforts to interfere in the 2016 Presidential election[.]"[3] As part of this investigation, in October

---

[2] (U) Under some circumstances, certain FISC opinions and orders have been released in response to FOIA requests or as part of Intelligence Community ("IC") transparency efforts. *See* 50 U.S.C. § 1872.

[3] (U) On March 20, 2017, then-FBI Director James B. Comey publicly confirmed the existence of this investigation in testimony before Congress, stating "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).

5

SECRET//NOFORN

2016, the FBI first sought and obtained a FISA warrant to conduct surveillance on Carter Page. Like any other FISA application and resulting order, the existence of the Carter Page FISA was a classified fact. The Government thereafter sought and obtained three renewals from the FISC to continue surveilling Page. The existence of each of those applications and resulting orders was also classified.

(15)   (U)  Separately, in March 2017, the House Permanent Select Committee on Intelligence ("HPSCI") announced an investigation into "the Russian active measures campaign targeting the 2016 U.S. election." *See* https://intelligence.house.gov/news/ documentsingle.aspx?DocumentID=767.  Although not originally part of the scope of that investigation, HPSCI added additional areas of inquiry, including the purported abuse of FISA. *See* https://intelligence.house.gov/uploadedfiles/hpsci_russia_investigation_one_page_summary. pdf.  As part of its investigation, HPSCI sought and was ultimately provided access to the Carter Page FISA applications and orders.

(16)   (U)  On May 17, 2017, Acting Attorney General Rod Rosenstein appointed Robert S. Mueller as Special Counsel. *See* DOJ Order No. 2915-2017 (May 17, 2017).  Under the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." The FBI's FISA authorized surveillance on Page continued after the Special Counsel was appointed.

(17)   (U)  In February 2018, the HPSCI Majority and Minority issued two memoranda

SECRET//NOFORN

regarding HPSCI's Russia investigation, which are often colloquially referred to by the names of the HPSCI Chairman and Ranking Member – *i.e.*, as the "Nunes Memo" and the "Schiff Memo." As originally drafted, both memoranda were classified because they revealed FISA authorized surveillance on an identified target – Carter Page.[4]

(18)   (U)  HPSCI voted to release the Nunes Memo publicly but could not immediately do so because it was classified at the Top Secret level.  Thus, pursuant to clause 11(g) of Rule X of the House of Representatives, HPSCI forwarded the Nunes Memo to President Trump with a request to declassify it.  The declassification request did not ask the President to opine on the judgments and conclusions of the HPSCI Majority.

(19)   (U)  On February 2, 2018, President Trump declassified the Nunes Memo "in light of the significant public interest in the memorandum." *See* Letter from Donald F. McGahn II, Counsel to the President, to Devin Nunes, Chairman of HPSCI (Feb. 2, 2018).  HPSCI thereafter publicly released the Nunes Memo with a cover letter authored by Mr. McGahn documenting the President's action (which was also noted on the Nunes Memo itself with a stamp stating "Declassified by order of the President February 2, 2018").  Mr. McGahn's cover letter made it "clear [that] the Memorandum reflects the judgments of its congressional authors." *See* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-SD001.pdf.

(20)   (U)  Subsequently, the HPSCI Minority submitted the Schiff Memo to DOJ,

---

[4] (U) Under classification rules, an entire document is classified if any single piece of information in it is classified. So, for example, an entire document is classified as Top Secret if it contains any Top Secret information, even if it also contains Secret, Confidential, or unclassified information. Moreover, information that by itself is unclassified can become classified when combined or associated with other unclassified or classified information, if the compiled information reveals an association or relationship that meets the standards and criteria for classification (*i.e.*, when disclosure of the compiled information would, itself, reveal classified information).

asking

asking for a classification review. The FBI conducted the review requested by the HPSCI Minority and identified those portions of the Schiff Memo that contained classified information unaffected by the President's declassification of the Nunes Memo.[5]

(21)  (U) The FBI did not declassify any additional information during the review of the Schiff Memo, nor did the HPSCI Minority request any further declassification. Rather, the FBI conducted a review to identify what information remained classified, in light of the President's declassification of the Nunes Memo. The HPSCI Minority redacted those portions of the Schiff Memo that the FBI identified as classified, and then released the redacted memorandum. *See* https://docs.house.gov/meetings/ig/ig00/20180205/106838/hmtg-115-ig00-20180205-sd002.pdf.

(22)  (U) As with the HPSCI Majority, the HPSCI Minority did not ask the FBI to opine on their judgment or conclusions, and the FBI did not do so. And as with the Nunes Memo, the Schiff Memo reflects the judgments of its congressional authors.[6]

(23)  (U) Although DOJ and the FBI had previously and properly refused to confirm or deny the existence of any records responsive to plaintiff's request on the grounds that doing so could reasonably be expected to reveal classified information, among other things, the

---

[5] (U) The President's declassification of the Nunes Memo resulted only in the declassification of the classified information contained in that memorandum. It did not broadly declassify all information contained in or related to the Carter Page FISA applications and orders.

[6] (U) On January 4, 2018, Senators Grassley and Graham referred to DOJ their allegations that Christopher Steele had violated 18 U.S.C. § 1001. The referral memorandum referenced the Page FISA applications/orders and identified Steele, a classified intelligence source. Thus, the memorandum was classified. After the declassification of the Nunes Memo and the release of the Nunes and Schiff Memos, the FBI was asked to conduct a classification review of the referral memorandum so that the Senate could publicly release it. The FBI conducted that classification review and identified the portions that remained classified following the declassification of the Nunes Memo. The memorandum reflects the Senators' judgments and conclusions; they did not ask the FBI to opine on them and the FBI did not do so as part of its classification review.

8

SECRET//NOFORN

President's declassification of the existence of the Carter Page FISA applications and orders, through his declassification of the Nunes Memo, pierced that Glomar response as to the four FISA applications and resulting orders referenced in the Nunes Memo.[7]

(24)    (U) As a result of the President's declassification of the existence of four Carter Page FISA applications and orders, DOJ and the FBI undertook a FOIA review of the four sets of applications and orders to determine whether any information necessarily had to be disclosed in light of the President's declassification order.  On July 20, 2018, the FBI produced all reasonably segregable, non-exempt portions of those four FISA packages in response to plaintiff's FOIA request at issue in this case, among others.[8]

(25)    (U) Substantial portions of the Page FISA materials remain classified; the President's declassification of the Nunes Memo resulted in the declassification of a relatively limited amount of information.  Thus, the information that remains classified was protected pursuant to FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1).  Furthermore, as previously noted, the materials contain investigative information relevant to the pending investigation into Russia's interference in the 2016 Presidential election.  Disclosure of this withheld relevant information (none of which exactly matches that disclosed in the Nunes, Schiff, or Grassley/Graham Memos) could reasonably be expected to interfere with this active and pending investigation.[9]  *See* 5

---

[7] (U) The Nunes Memo referenced an initial FISA application and order from October 2016, and three renewals thereafter.

[8] (U) Because the FBI received more than three requests to which the Carter Page FISA packages were responsive, the records were posted to The Vault, the FBI electronic reading room, on July 21, 2018.  *See* 5 U.S.C. § 552(a)(2)(D)(ii)(II).

[9] (U) While the three Congressional memoranda each reflect statements by the Legislative Branch, not the Executive Branch, in light of the President's actions with respect to the Congressional memoranda, the FBI identified and released any information contained in the four Page FISA packages that matched information released in the Congressional memoranda.

9

U.S.C. § 552(b)(7)(A).  The FISA packages also contain information from and about intelligence

sources, and detailed information about intelligence methods, including non-public information

about FISA surveillance.  This information was also protected.  *See* 5 U.S.C. §§ 552(b)(3),

(b)(7)(D), (b)(7)(E).  Finally, these documents contain personally-identifying information about

DOJ and FBI personnel and other third parties, which was withheld pursuant to the FOIA.  *See* 5

U.S.C. §§ 552(b)(6), (b)(7)(C).

 (26) (U)  Plaintiff's request is broader than the four acknowledged applications and

resulting orders, however.  As discussed further below, the FBI's original Glomar response was

pierced only in a very limited fashion for those four acknowledged applications and resulting

orders.  It remains in place as to any other responsive applications and orders, with one other

exception.  Specifically, on March 20, 2017, then FBI Director James B. Comey specifically

addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama

had had President Trump's "'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping
> directed at him by the prior administration, I have no information
> that supports those tweets and we have looked carefully inside the
> FBI.  The Department of Justice has asked me to share with you
> that the answer is the same for the Department of Justice and all its
> components.  The Department has no information that supports
> those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian

Interference in the 2016 U.S. Election, March 20, 2017.  https://www.washingtonpost.com/news/

post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-

interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last access 6/12/2017).

 (27) (U)  Aside from this statement and the acknowledgment of the four Page FISA

applications and accompanying FISC orders, neither the FBI nor DOJ have publicly commented

SECRET//NOFORN

on or acknowledged the existence or non-existence of any other FISA records within the scope of plaintiff's FOIA request, and the FBI's Glomar response remains intact as to the existence or non-existence of any other responsive records.

(U) SEARCH

(28)　(U)　In most instances, when searching for records to respond to a FOIA request, RIDS's first step is to conduct a search of the FBI's Central Records System ("CRS"). Such a search was not necessary here. In this case, a known universe of responsive records was revealed through the release of the Nunes and Schiff Memos. Specifically, the memoranda revealed the existence of four FISA applications submitted for surveillance on Carter Page, starting in October 2016 and continuing through three renewals, with accompanying FISA orders. FBI FOIA personnel consulted with FBI personnel familiar with the Russia investigation to locate the four Page FISA packages. Through these efforts, the FBI was able to locate each of the four packages. At the same time, the FBI also contacted DOJ's National Security Division ("NSD"), which represents the Government before the FISC, to obtain copies of all four applications that NSD had submitted to the FISC and all accompanying orders on the applications. NSD provided the FBI copies of all four packages for processing. The FBI then confirmed that between its records and the NSD records, it had complete copies of each of the four FISA packages on Carter Page that had been revealed by the Nunes and Schiff Memos.

(29)　(U)　With regard to Item 2 of plaintiffs' request, the FBI interpreted this to include the four final applications actually submitted to the FISC seeking authorization for surveillance of Carter Page, which resulted in orders from the FISC authorizing surveillance. The FBI did not interpret Item 2 to include all versions or drafts of those applications, as plaintiffs did not specifically reference other versions or drafts.

11

(30)   (U)  With regard to Item 3 of plaintiffs' request, a separate search was not required because the minimization procedures that DOJ proposed and that the FISC ordered with regard to the Page surveillance are included within the four applications and resulting FISC orders.

## (U) FOIA EXEMPTIONS

(31)   (U)  The FBI carefully reviewed, processed, released to plaintiff (and others), and posted to The Vault all non-exempt portions of the four Page FISA packages (applications and orders) that were revealed in the Nunes Memo.[10]  In conjunction with DOJ, the FBI conducted a thorough review of each page and redacted information or withheld pages in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(32)   (U)  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of non-exempt material.  No reasonably segregable, non-exempt portions have been withheld.  To further describe the information withheld could reveal the very material which the FBI seeks to protect.

(33)   (U)  On the pages released to plaintiff, each redaction is marked by two pieces of information:  a FOIA exemption (*e.g.*, "(b)(6)") and a code (*e.g.*, "-1").  The FOIA exemption marking shows that the redaction contains information determined to be exempt under that particular exemption.  The code corresponds to a particular category of information determined to be exempt.  For example, where "(b)(6)-1" appears on a document, it signals that the FBI relied on FOIA Exemption (b)(6), which protects against unwarranted invasions of personal

---

[10] (U) The released pages are Bates numbered "17-cv-597 (FBI)-1" through "17-cv-597 (FBI)-412."  A chart identifying which exemptions were cited on which pages is attached hereto as **Exhibit B**.

privacy, to protect a particular category of information – *i.e.*, the names and/or other identifying

information of FBI Special Agents or Support Personnel.

(34)    (U) A key to the coding system applied to the Carter Page FISA records follows:

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| **Exemption (b)(1)** | **Classified Information** |
| (b)(1)-1 | Information properly classified by an FBI Original Classification Authority pursuant to Executive Order 13526 |
| **Exemption (b)(3)** | **Information Protected by Statute** |
| (b)(3)-1 | Intelligence sources and methods, prohibited from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **Exemptions (b)(6) and (b)(7)(C)** | **Unwarranted Invasions of Personal Privacy** |
| (b)(6)-1 (b)(7)(C)-1 | Names of FBI Special Agents |
| (b)(6)-2 (b)(7)(C)-2 | Personally-identifying and other non-public information about Carter Page |
| (b)(6)-3 (b)(7)(C)-3 | Names of and/or other information about one FISC employee and one NSD employee |
| (b)(6)-4 (b)(7)(C)-4 | Information sufficient to identify a third party who was a source of information relied upon in the Carter Page FISA applications |
| **Exemption (b)(7)(A)** | **Pending Enforcement Proceedings** |
| (b)(7)(A)-1 | Information which, if disclosed, could reasonably be expected to interfere with the pending Russia investigation |
| **Exemption (b)(7)(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names of or other identifying information about individuals who provided information under an express assurance of confidentiality, and any information that they provided |
| **Exemption (b)(7)(E)** | **Investigative Techniques and Procedures** |
| (b)(7)(E)-1 | Information revealing the investigative focus of an investigation |
| (b)(7)(E)-2 | Information about the collection and/or analysis of information |
| (b)(7)(E)-3 | Information that would reveal the specific techniques authorized for and used in national security investigations |
| (b)(7)(E)-4 | Information about specific databases utilized by the FBI for investigative and law enforcement purposes |
| (b)(7)(E)-5 | Information about monetary payments in relation to utilization of investigative techniques, such as the payment of confidential human sources |
| (b)(7)(E)-6 | Information about the targets, dates, and scope of surveillance |

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| (b)(7)(E)-7 | Information that would reveal the dates and types of investigations (*i.e.*, preliminary investigations, full investigations) |
| (b)(7)(E)-8 | Information that would reveal investigative strategies for utilizing particular evidence |

### (U) *Exemption (b)(1) – Classified Information*

(35)    (U)  Given that FISA applications and orders, by their nature, contain sensitive classified intelligence information, and given that the declassification of the Nunes Memo did not impact all information in the four Page FISA packages, it should be unsurprising that the FBI protected a relatively significant amount of information under Exemption (b)(1) here.

(36)    (U)  Exemption (b)(1) protects from disclosure records that are (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) in fact properly classified pursuant to such Executive Order.  5 U.S.C. § 552(b)(1).

(37)    (U)  The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps.  The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive and procedural criteria of the Executive Order.

(38)    (U)  E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense or foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying information.  I am bound by its requirements when making classification determinations.

14

SECRET//NOFORN(39)    (U)  For information to be properly classified, and thus properly withheld pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth in E.O. 13526 § 1.1(a), which requires:

(1)    an original classification authority must have classified the information;

(2)    the information must be owned by, produced by or for, or be under the control of the United States Government;

(3)    the information must fall within one or more of the categories of information listed in § 1.4 of [the] order; and

(4)    the original classification authority must determine that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority must be able to identify or describe the damage.

(40)    (U)  The information covered by Exemption (b)(1) here is under the control of the United States Government, falls within applicable categories of E.O. 13526 § 1.4, and requires a classification marking at the TOP SECRET level because unauthorized disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security, or at the SECRET level because the unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security.  *See* E.O. 13526 § 1.2(a)(1)-(2).

(41)    (U)  In addition to these substantive requirements, certain procedural and administrative requirements set forth in E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents. Specifically, E.O. 13526 requires that:

(a)    Each document was marked as required and stamped with the proper classification designation.  *See* E.O. 13526 § 1.6(a)(1) – (5).

(b)    Each document was marked to indicate clearly which portions are

15

classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b).  *See* E.O. 13526 § 1.6(a)(5)(c).

(c)   The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were followed.

(d)   The declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed.

(e)   Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

(42)   (U)  With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the four Page FISA applications and accompanying orders is currently and properly classified at the TOP SECRET or SECRET level pursuant to E.O. 13526, and satisfies both the procedural and substantive requirements set forth in the Executive Order.

(43)   (U)  Specifically, this information is owned by, was produced by or for, and is under the control of the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the TOP SECRET or SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526 § 1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources," *see* E.O. 13526 § 1.4(d), because unauthorized disclosure of this information could be expected to cause exceptionally grave damage to national security (for information classified at the TOP SECRET level) or serious damage to national security (for information classified at the SECRET level). This is discussed further below.

(44)   (U)  I examined the information protected in this case pursuant to Exemption

16

SECRET//NOFORN

(b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files. Equal consideration was given to the impact that other information – both in the public domain and likely known or suspected by present or potential adversaries of the United States – would have upon the information protected here.

(45)    (U) The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

(U) *E.O. 13526 § 1.4(c) – Intelligence Activities, Sources and Methods*

(U) **Overview**

(46)    (U) E.O. 13526 § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology." An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity, source, or method has two

17

characteristics. First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(47)    (U) Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(48)    (U) Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

### (U) **Information Protected In This Case**

(49)    (U) As discussed below, information withheld under Exemption (b)(1) in

18

conjunction with E.O. 13526 § 1.4(c) would, if disclosed, reveal otherwise non-public information regarding: the FBI's intelligence interests, priorities, activities, and methods; undisclosed intelligence sources or methods upon which the FBI relied in support of its application for FISA authorized surveillance of Carter Page, as well as undisclosed portions of intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods, including the specific details of the surveillance of Carter Page authorized by the FISC via the four applications and orders publicly revealed in the HSPCI memoranda. All of this information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

### (U) **Intelligence Activities and Methods**

(50)    (U)  In the four Page FISA applications and accompanying orders, the FBI protected details about intelligence activities undertaken by the FBI and the methods utilized during those intelligence activities. This information includes the details about the FISA surveillance sought and obtained through the four Page FISA applications and accompanying orders, but also includes information about other intelligence activities and methods utilized by the FBI that were included in the responsive records.

(51)    (U)  With regard to the FISA surveillance of Page, the withheld information reveals the specific surveillance method(s) sought and authorized by the FISC, including citations to relevant legal authorities that would reveal the specific method(s) sought or authorized with respect to a specific individual during a particular timeframe. The withheld information includes the minimization procedures, which are specifically tied to the particular surveillance methods and activities requested by DOJ and authorized by the FISC. Using the fourth application and resulting order as an example, this information was protected on Bates

19

pages 17-cv-597(FBI)-361-364 and 404-411.

(52)   (S//NF) ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

(53)   (U) The withheld information also reveals:  descriptions of and the particulars about implementing the authorized surveillance method(s); information that would reveal the

20

exact periods of FISA authorized surveillance[11]; what information was being sought through the surveillance; and any information obtained as a result of the FISA-authorized surveillance of Page included in the second through fourth applications.

(54)    (S//NF) ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

(55)    (S//NF) ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[11] (U) This includes the FISC docket numbers and the specific dates on which coverage was sought and authorized (including as reflected in the "declassify on" dates in the classification blocks).

████████████

(56)   (U)  The withheld information also reflects intelligence-gathering activities,

including specific intelligence methods used and information obtained in broader contexts.

Using the fourth application and resulting orders as an example, this information was protected

on Bates pages 17-cv-597(FBI)-301-302, 304-308, 311-312, 317-319, 324-325, 353, and 386.

(57)   (U)  Finally, the withheld information includes information about Source #1's

intelligence reporting activities and the period of time he served as an intelligence source for the

FBI.  While some information about Source #1 has been declassified and disclosed, other

information remains classified and has not been publicly disclosed.  Using the fourth application

and resulting orders as an example, this information was protected on Bates pages 17-cv-

597(FBI)-308-316.

(58)   (U)  The disclosure of the above-described types of information could reasonably

be expected to cause serious damage to the national security, as it would: (a) reveal actual

intelligence activities undertaken by the FBI, and the methods used in doing so, regarding

specific targets and during specific periods of time; (b) disclose the intelligence-gathering

capabilities of the methods; and (c) provide an assessment of the level of penetration by the FBI

of specific targets during the specific time period.  Armed with such information, adversaries,

including hostile foreign governments, could implement actions to thwart the FBI's intelligence

activities and weaken or negate the particular intelligence methods, which would severely disrupt

the FBI's intelligence-gathering capabilities.  Accordingly, this information is currently and

properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly

withheld it under Exemption (b)(1).

(59)   (U)  The FBI also concluded that the specific amounts of payments made to

22

intelligence sources reflected in the records is classified intelligence method information. Without adequate context, the particular amount paid to a particular intelligence source could be viewed to suggest the relative volume of information provided by a particular source, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's intelligence activities. Moreover, disclosure would reveal non-public information about the level of resources devoted to particular targets or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its intelligence gathering mission. Revealing the amount of money the FBI has paid to particular intelligence sources and over particular periods of time would reveal the FBI's level of focus on certain intelligence gathering efforts. Revealing this level of focus would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence-gathering activities. This would give sophisticated adversaries and hostile governments the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI's strength areas and exploit its weak ones. Accordingly, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

### (U) **Intelligence Sources**

(60)    (U) An intelligence source who requires continued classification is one that provided or is currently providing information that pertains to national security matters, the

23

disclosure of which could reasonably be expected to result in serious damage to the FBI's
intelligence-gathering capabilities.

(61)    (U) Although some information about Source #1 and his activities has been
declassified and publicly disclosed, the four Page FISA applications include information about
other intelligence sources. This information, including specific information about the sources
themselves as well as the information they provided, is singular in nature and, if disclosed,
reasonably could be expected to identify the contributing sources.

(62)    (U) Disclosure of the identities of intelligence sources could reasonably be
expected to jeopardize their livelihoods, their families and other relationships, and even their
lives. Moreover, disclosure of one source can reasonably be expected to cause other current and
potential intelligence sources to fear that their identities will be publicly revealed at some point.
Using the fourth application and resulting orders as an example, this information was protected
on Bates pages 17-cv-597(FBI)-308-319.

(63)    (U) Thus, the release of source-identifying information can reasonably be
expected to cause damage to the national security by causing current intelligence sources to
cease providing information, and discouraging potential intelligence sources from cooperating
with the FBI for fear their identities would be publicly revealed at some point. Such a source
reaction would eliminate one of the Intelligence Community's most crucial means of collecting
intelligence information and, therefore, severely hamper the FBI's intelligence and investigative
missions. Accordingly, some of the protected intelligence source information here is currently
and properly classified pursuant to E.O. 13526, § 1.4(c) at the TOP SECRET level, for
intelligence source information that could reasonably be expected to cause exceptionally grave
damage to the national security, and some of the protected intelligence source information here is

24

currently and properly classified at the SECRET level, for intelligence source information that could reasonably be expected to cause serious damage to the national security. The FBI properly withheld this information under Exemption (b)(1).[12]

### (U) *E.O. 13526 § 1.4(d) – Foreign Relations or Foreign Activities*

(64)    (U) E.O. 13526 § 1.4 (d) authorizes the classification of information about foreign relations or foreign activities of the United States, including confidential sources. Such information includes information gathered from/with the assistance of and/or about foreign countries. It is sensitive due in part to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments.

(65)    (U) The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; the loss of the cooperation and assistance of friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. Due to the nature of the information here, the FBI cannot provide any more specific details on the public record about its basis for redacting information pursuant to E.O. 13526, § 1.4(d) and Exemption (b)(1). However, as the FBI's classified portions of this declaration demonstrate, this information is currently and properly classified and was appropriately redacted by the FBI.

(66)    (S//NF) ████████████████████████████████████

████████████████████████████████████████

---

[12] (U) The intelligence source information protected in the FISC orders is classified at the SECRET level only. The FISA applications include information classified at both the SECRET and the TOP SECRET levels.

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

(67)    (U) Thus, the FBI protected such information because, if disclosed, it could

reasonably be expected to cause serious damage to national security. Because this information

remains currently and properly classified, pursuant to E.O. 13526 § 1.4(c), the FBI properly

protected it under Exemption (b)(1).

(U) *Exemption (b)(3) – Information Protected by Statute*

(68)    (U) Exemption (b)(3) protects information that is specifically exempted from

public disclosure by a statute that requires that the matters be withheld from the public in such a

manner as to leave no discretion on the issue, establishes particular criteria for withholding, or

refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3)(A). If the non-

disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it

must specifically cite this paragraph in order for Exemption (b)(3) to apply. *Id.* at §

552(b)(3)(B).

(69)    (U) As explained above, the four Page FISA applications and resulting orders,

include information that is classified pursuant to E.O. 13526 § 1.4(c) to protect intelligence

sources and methods, which the FBI has protected under Exemption (b)(1). Those same

intelligence sources and methods are also exempt here under Exemption (b)(3). Specifically,

their disclosure is prohibited pursuant to the National Security Act of 1947, as amended, which

provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

(70)     (U)  As relevant to the FBI's application of Exemption (b)(3), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its face, leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.

(71)     (U)  In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.  50 U.S.C. §§ 3024(i)(1).  The FBI is one of the member agencies comprising the IC, and as such must protect intelligence sources and methods.

(72)     (U)  Accordingly, the information in the Page FISA applications and resulting FISC orders that reveals intelligence sources and methods is prohibited from disclosure pursuant to 50 U.S.C. § 3024(i)(1) and thus exempt from disclosure under Exemption (b)(3).

(73)     (S//NF)  [REDACTED]

27



(U) *Exemption (b)(7) – Law Enforcement Information*

(U) *Threshold*

(74)     (U)  The first step in applying any of Exemption (b)(7)'s subparts is to demonstrate that the records or information at issue were compiled for law enforcement purposes.  5 U.S.C. § 552(b)(7).  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement responsibility of the agency.

(75)     (U)  Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to:  investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

(76)     (U)  As discussed previously, and as has been publicly disclosed, in July 2016, the FBI opened an investigation of the Russian government's efforts to interfere in the 2016 election.

28

The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter

Page in the course of that investigation. The FBI thereafter sought and obtained three renewals

from the FISC to continue surveilling Page. Those applications were compiled as part of the

FBI's investigation of Russian election interference.

(77)    (U) The only circumstance under which the FBI can request a FISA order is

when the FBI is conducting an authorized, predicated national security investigation within the

scope of its law enforcement and foreign intelligence responsibilities. The Russia investigation

is clearly within the law enforcement and foreign intelligence responsibilities of the FBI.

Similarly, any records reflecting NSD and FBI's efforts to respond to questions from the FISC

about the application(s) were compiled in furtherance of this law enforcement purpose. Thus,

Exemption (b)(7)'s threshold is easily satisfied here.

(78)    (U) In May 2017, the Acting Attorney General appointed Special Counsel Robert

S. Mueller, III and authorized him to conduct the investigation confirmed by then-FBI Director

Comey in Congressional testimony, including "(i) any links and/or coordination between the

Russian government and individuals associated with the campaign of President Donald Trump;

and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other

matters within the scope of 28 C.F.R. § 600.4(a)." DOJ Order No. 3915-2017, Appointment of

Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and

Related Matters (May 17, 2017)). In addition, "[i]f the Special Counsel believes it necessary and

appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the

investigation of these matters." *Id.*

(79)    (U) Accordingly, the Page FISA applications and orders are records that were

compiled in part for law enforcement purposes, and Exemption (b)(7)'s threshold is easily

29

satisfied here.

(U) ___*Exemption (b)(7)(A) – Pending Enforcement Proceedings*___

(80)    (U) Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(81)    (U) Thus, to apply Exemption (b)(7)(A), the FBI must establish the existence of a pending or prospective investigation or other enforcement proceeding and must show a reasonable expectation that disclosure of the withheld information could interfere with that proceeding.

(82)    (U) Here, the enforcement proceeding at risk is the Russian interference investigation. That investigation is pending as of the date of this filing.

(83)    (U) The FBI, in consultation with DOJ, concluded that disclosure of a variety of information in the Page FISA applications and orders could reasonably be expected to interfere with the pending Russian election interference investigation if publicly disclosed at this time.

(84)    (U) The FBI is limited in the amount of information it can provide publicly about how the investigation may be adversely affected by disclosure of this information without the explanation itself risking harm to the investigation or revealing information exempt under one or more other exemptions. Although there has been extensive media coverage of the investigation, that coverage often relies on speculation, assumptions, and anonymous/unnamed sources. Greater harm to the investigation would result from official disclosures, regardless of whether it confirmed or refuted widespread media reporting. That is because official disclosure directly reveals law enforcement activity or lack thereof, removing doubts or ambiguity inherently present in other reporting.

(85)     (U) Broadly speaking, the redacted/withheld portions of the four Page FISA applications and accompanying orders could reasonably be expected to adversely affect the pending investigation by revealing aspects of the investigation that have not previously been made public; what information or activities are or are not of interest to investigators, and areas where there may be gaps in the investigators' knowledge about such information/activities that could be exploited by targets and other adversaries; who investigators have already spoken with or interviewed and what they said (and did not say); and whether particular persons or entities are or are not of interest in the investigation.

(86)     (U) Moreover, the FBI has explained herein why particular types of information contained in the four Page FISA applications and accompanying orders are exempt under other exemptions because of the harm associated with disclosure.  While Exemption (b)(7)(A) considers the impact on a specific investigation or investigations, the big-picture risks to law enforcement, national security, and privacy interests addressed by the other exemptions are relevant here, and indeed are more immediate here.

(87)     (U) Disclosing information that would identify confidential and/or classified intelligence sources or other individuals who are or could become witnesses risks their compromise through efforts to discredit, harass, or even threaten them.  This, in turn, creates the risk of curtailing their further cooperation, which can significantly hamper an investigation.[13]

(88)     (U) Similarly, disclosing the evidence, information, or intelligence (including source reporting) already obtained by/known to the FBI risks influencing, compromising, or tainting testimony by other witnesses and/or the fabrication of other information/falsification of

---

[13] (U) The harms in disclosing information about and from confidential sources is discussed further in the Exemption (b)(7)(D) discussion below.

SECRET//NOFORN

other testimony for the purpose of countering or undermining the credibility of the evidence, information, or intelligence already gathered. It would also reveal gaps in the FBI's knowledge of information, intelligence, or source reporting/witness testimony, which risks destruction or adulteration of evidence or fabrication of false evidence, and attempts to intimidate or improperly influence potential sources/witnesses.

(89)   (U) Disclosing the investigative techniques already used in this case during specific time periods[14] and regarding specific subject matter areas creates a risk of revealing what investigators already know, what they do not or may not know yet, who is or may be of interest to investigators, and who may be cooperating in the investigation, which, for all reasons discussed above, would adversely affect the investigation. Moreover, providing details about the use of those techniques risks efforts by targets, subjects, and other adversaries to undermine or thwart the techniques.[15]

(90)   (U) Consistent with its standard practices, the FBI and SCO have not publicly identified the specific scope/focus of, subjects of, witnesses/sources in, or evidence/information from the pending Russia investigation, beyond the information made public through criminal justice proceedings. To the extent that information made public in those criminal proceedings

---

[14] (U) Included here would be the FISC docket numbers. If aggregated with each other and/or other FISC docket numbers, they could be used to pinpoint the times of FISA coverage on Page, which creates the risks discussed here in the Exemption (b)(7)(A) analysis, as well as those in the analysis of Exemption (b)(7)(E), and particularly category (b)(7)(E)-6, below.

(U) Disclosing the use of specific techniques during identified timeframes would allow targets and potential targets to determine the probability that the FBI is aware of particular information likely to be obtained through such techniques during that time as well as the probability that the FBI may not be aware of the information. Such knowledge could allow targets, potential targets, and others intent on disrupting the investigation to better target their activities toward, for example, creation or destruction of evidence, fabrication of cover stories, intimidation of witnesses, etc.

[15] (U) The risks of circumvention are discussed further in the Exemption (b)(7)(E) descriptions below.

32

SECRET//NOFORN

SECRET//NOFORN

exactly matched information in the four Page FISA packages processed in this case, it was not redacted. Moreover, while unclear that HSPCI's disclosures of the Nunes and Schiff Memos legally precluded the FBI's ability to assert FOIA exemptions over matching information in the four Page FISA packages processed here, the FBI nevertheless did not redact any exactly matching information. Furthermore, the FBI carefully considered whether to disclose similar information that was not an exact match to the memoranda, and asserted Exemption (b)(7)(A) only upon concluding that disclosure of the non-matching information could reasonably be expected to harm the investigation.

(91)   (U) For the reasons discussed above, combined with the justifications for protecting information under the other exemptions discussed herein, the FBI concluded that disclosure of information marked as "(b)(7)(A)-1" could reasonably be expected to interfere with the pending investigation. Accordingly, the FBI withheld that information pursuant to Exemption (b)(7)(A).

## (U) *Exemption (b)(7)(C) – Unwarranted Invasions of Personal Privacy*

(92)   (U) Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

(93)   (U) As previously noted in the section of this declaration concerning Exemption (b)(6), the practice of the FBI is to conjunctively assert Exemptions (b)(6) and (b)(7)(C) as they provide overlapping protections for personal privacy. Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by

SECRET//NOFORN

SECRET//NOFORN

both exemptions is sufficiently similar to warrant a consolidated discussion. Each exemption balances individuals' privacy interests against the public's interest in disclosure.

(94)    (U) For purposes of both exemptions, a public interest exists only when information would significantly increase the public's understanding of the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats; uphold and enforce the criminal laws of the United States; and provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.

(95)    (U) The FBI has relied on Exemptions (b)(6) and (b)(7)(C) here to protect the names of or information about FBI Special Agents and FISC and NSD employees; information sufficient to identify a third party who was the source of some information relied upon in the four Page FISA applications; and certain personally-identifying and other non-public private information about Carter Page.

(U) **(b)(6)/(b)(7)(C)-1**    **FBI Special Agents**

(96)    (U) The FBI withheld the names of the FBI Special Agents who signed the Page FISA applications processed in response to plaintiff's request. These Special Agents were assigned to the pending Russia investigation during the period covered by the four Page FISA applications and are experienced counterintelligence agents.

(97)    (U) The FBI regularly protects the identities of its Special Agents. FBI agents have access to information regarding official law enforcement investigations, and therefore may become targets of harassing inquiries for unauthorized access to information regarding such investigations if their identities were released. This is particularly true of agents who work national security cases, including counterintelligence cases, who have access to some of the most sensitive and highly classified information possessed by the FBI. Assignments of agents to any

34

particular investigation or matter are not by choice. Publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. FBI agents also have privacy interests in being free from unnecessary, unofficial questioning regarding their conduct in particular investigations, whether or not they are currently employed by the FBI. For example, an individual investigated by the FBI may carry a grudge and may seek revenge on the agents involved in that investigation.

(98)    (U) Many of these concerns are heightened when the agents whose identities are protected work counterintelligence cases. The FBI's counterintelligence mission involves protecting the secrets of the U.S. Intelligence Community from risks of espionage and insider threats; protecting the nation's critical assets; and countering the activities of foreign spies. FBI counterintelligence investigations involve significant threats to the national security of the United States by foreign intelligence services and other hostile government actors. FBI agents responsible for conducting these investigations can be exposed to real and substantial threats to their lives and safety, and the FBI's concerns about targets of such investigations holding grudges against such agents are more acute when those targets are foreign intelligence officers from hostile governments.

(99)    (U) Here, the above-described reasons led the FBI to conclude that the Special Agents whose names are protected here have substantial privacy interests. That determination is further bolstered by the fact that the investigation and specific investigative activity at issue here are very high-profile and have been the subject of substantial media attention and speculation.

(100)    (U) In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's

35

understanding of the FBI's operations and activities with respect to obtaining the four FISA

warrants on Page, the conduct of the Russia investigation *writ large,* or any other FBI operations

or activities.

(101)  (U)  In the absence of a public interest, the Special Agents' substantial privacy

interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C).

Accordingly, the FBI properly protected the names of its Special Agents.[16]

(U)  **(b)(6)/(b)(7)(C)-2**      **Carter Page**

(102)  (U)  While the declassification of the Nunes Memo and the release of it and the

Schiff Memo revealed to the public that Carter Page had been the subject of FISC-authorized

surveillance under the FISA, there nevertheless remains information about him contained in the

FISA applications and FISC orders that was not made public and in which he retains a privacy

interest.  The FBI cannot publicly describe the nature of the information it has protected without

revealing information that is exempt under these or other cited exemptions.

(103)  (S//NF)  ███████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

(104)  (S//NF)  ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

---

[16] (U)  These Special Agents are non-executive employees.

(105)  (U)  After concluding that Page retains substantial privacy interests in the

redacted information, the FBI considered whether there is any public interest that overrides these

privacy interests.  While there is certainly a demonstrated public interest in these FISA

applications, the particular information about Carter Page that has been protected here would not

so significantly increase the public's understanding of the FBI's operations and activities in

relation to obtaining authority from the FISC on four occasions to surveil Page pursuant to the

FISA.  Thus, on balance, the FBI concluded that Page's privacy interests outweighed any public

interest in the redacted information.

(U)  **(b)(6)/(b)(7)(C)-3**      **FISC and NSD Employees**

(106)  (U)  The information falling within this category consists of the names and titles

of a FISC deputy clerk and the NSD attorney who signed and submitted the four Page FISA

applications to the FISC.  Neither of these employees is an executive-level employee.  The FBI

regularly protects the names and identities of employees of other Government agencies or offices

who are identified in FBI law enforcement records.  The reasons for doing so are similar to the

FBI's reasons for protecting the identities of its Special Agents as detailed above.

37

SECRET//NOFORN

(107)   (U)  Here, the FISC and NSD employees whose identities the FBI protected are in positions to access highly-sensitive and classified information concerning counterintelligence and counterterrorism matters.  If their identities were disclosed, they could become targets of harassing inquiries for unauthorized access to non-public information about the four Page FISAs specifically, or more generally, non-public information about other FISC matters, FBI investigations, or IC intelligence activities to which they may have access.  Disclosure of their identities would also risk hostile action by adverse foreign powers, either by way of revenge or of actively targeting them in intelligence-gathering operations.

(108)   (U)  In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the four FISA warrants on Page, the conduct of the Russia investigation *writ large*, or other FBI operations or activities.

(109)   (U)  In the absence of a public interest, these employees' substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C). Accordingly, the FBI properly protected the names and titles of these FISC and NSD employees.[17]

(U)  **(b)(6)/(b)(7)(C)-4**          **Third Party Who Was a Source of Information Relied Upon in the Carter Page FISA Applications**

(110)   (U)  The FBI protected information that would identify an individual who was a source of information that came into the FBI's possession during a particular phase of the

---

[17] (U)  Information about the NSD employee was also redacted pursuant to Exemptions (b)(6) and (b)(7)(C) at NSD's request.

SECRET//NOFORN

investigation. This identifying information appears on one page in the third FISA application and one page in the fourth FISA application.[18]

(111)   (U)  Individuals identified in FBI investigative materials have substantial privacy interests in not being publicly linked with a sensitive national security investigation.  Such public exposure could subject the individuals to harassment, intimidation, or threats of legal or economic reprisal; possible physical harm; or even death.  These considerations led the FBI to conclude that this individual has substantial privacy interests here, particularly considering that the investigation is a sensitive investigation involving the activities of a foreign government and has received such wide-spread attention.  In contrast, the identity of this individual who is mentioned in a single footnote in two of the applications would not, without more, significantly increase the public's understanding of FBI operations or activities.  Accordingly, the FBI concluded that this individual's privacy interests outweighed any public interest in his/her identity, and protected the information under Exemptions (b)(6) and (b)(7)(C).

(U)  ***Exemption (b)(7)(D) – Confidential Source Information***

(112)   (U)  Exemption (b)(7)(D) protects records or information compiled for law enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by the confidential source.

---

[18]  (U)  The particular identifying information about this third party is not classified and the individual did not provide information directly to the FBI as part of its investigation.  Accordingly, the FBI has not cited Exemptions (b)(1) or (b)(7)(D) to protect this particular individual.

SECRET//NOFORN

5 U.S.C. § 552(b)(7)(D). Exemption (b)(7)(D) provides categorical protection for the identities of confidential sources, as well as information provided by such a source in a criminal or national security investigation. No balancing of interests is required and the public's interest in the information is not a factor. Rather, once the FBI establishes that the source provided information under express or implied assurances of confidentiality, the identity of the source and all information the source provided in a criminal or national security investigation are exempt under Exemption (b)(7)(D).

(113)  (U)  The FBI regularly relies on confidential sources. Confidential sources may provide information under express assurances of confidentiality, and are "informants" within the common meaning of the term, although the FBI refers to them as "Confidential Human Sources" or "CHSs." Alternatively, confidential sources may provide information under circumstances from which assurances of confidentiality may be inferred. In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. Information provided by these sources is singular in nature, and if released, could reveal their identities. Sources must feel free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public and that they may, as a result, face reprisals. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(114)  (U)  The release of a source's identity could forever eliminate that source as a future means of obtaining information, and also has a chilling effect on the cooperation of other sources. Revealing the identities of confidential sources risks one of the FBI's most important

40

SECRET//NOFORN

means of collecting information and intelligence, and severely hampers law enforcement efforts
to detect and apprehend individuals engaged in the violation of federal criminal and national
security laws.

(115)   (U) As a result of the declassification of the Nunes Memo, and the release of both
of the HSPCI memoranda, it was publicly revealed that the FBI relied on a confidential and
classified intelligence source, referred to throughout the Page FISA applications as "Source #1."
The FBI has not protected information about this source's identity, nor has it protected
information he provided that matches information revealed in the HPSCI memoranda or the
Grassley/Graham letter. The FBI has protected information that would identify the identities of
other confidential sources who provided information or intelligence to the FBI; information
provided by those sources; and information provided by Source #1 that does not match
information revealed in the HPSCI memoranda or the Grassley/Graham letter.

(116)   (U) Source #1 was a code-named CHS for the FBI. By definition, such sources
are confidential. That is, as part of the FBI's protocols for CHSs, they are provided express
assurances of confidentiality. Moreover, Source #1 provided information in furtherance of a
sensitive national security investigation being conducted by the FBI. Accordingly, under the
second clause of Exemption (b)(7)(D), any information he provided is categorically exempt.
Thus, except as to information that matches information revealed in the HPSCI memoranda or
the Grassley/Graham letter, the FBI redacted all information provided by Source #1. Using the
fourth application and resulting orders as an example, this information was protected on Bates
pages 17-cv-597(FBI)-303, 309-310, and 312-317.

(117)   (U) The FISA applications also contain information about and from other sources
who cooperated with and provided information to the FBI under express assurances of

confidentiality. CHSs are provided express assurances of confidentiality by the FBI.

Accordingly, the FBI concluded that the requirements for express assurances of confidentiality

had been satisfied here. Further description of the bases for this conclusion as to the FISA

applications cannot be discussed publicly without disclosing information that is exempt under

this or one of the other exemptions cited in relation to this information. However, because these

sources cooperated with and provided information to the FBI in furtherance of a national security

(intelligence) investigation under express assurances of confidentiality, the requirements of

Exemption (b)(7)(D) are satisfied and the FBI properly protected information that would reveal

the identities of the sources, as well as the information that they provided to the FBI. Using the

fourth application and resulting orders as an example, this information was protected on Bates

pages 17-cv-597(FBI)-301-302, 308-311, and 317-318.

(118)   (S//NF)   ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

### (U) *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(119)   (U)   Exemption (b)(7)(E) protects "records or information compiled for law

enforcement purposes [when release] would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law." 5 U.S.C. § 552(b)(7)(E). This exemption affords categorical

protection to techniques and procedures used in law enforcement investigations. It protects

techniques and procedures that are not well-known to the public as well as non-public details

SECRET//NOFORN

about the use of publicly-known techniques and procedures.

## (U) (b)(7)(E)-1        Investigative Focus

(120)   (U)  Many investigative steps preceded the FBI's FISA applications; the four

Page FISA applications and orders reveal how the FBI conducted certain aspects of the

investigation to that date and a road-map of certain contemplated investigative steps (*i.e.*, the

requested surveillance).  Although the general techniques authorized by the FISA are publicly

known, this detailed information about how, when, where, and why such authorities are

employed in a particular investigation is not publicly known.  This type of detailed information

would be valuable to criminals and adversaries as a guide to adjusting their behaviors, taking

evasive actions, and developing countermeasures to thwart FBI investigations.  Accordingly, the

FBI protected this information in the four Page applications and resulting orders, including in the

minimization procedures, under Exemption (b)(7)(E) in order to the risk of circumvention posed

by disclosure of this information.

## (U) (b)(7)(E)-2        Collection and/or Analysis of Information

(121)   (U)  Category (b)(7)(E)-2 includes information that reveals the methods used by

the FBI to collect and analyze information it obtains for investigative purposes.[19]

(122)   (S//NF)  ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

---

[19]  (U) This information overlaps with the information protected in category (b)(7)(E)-3, which protects
specific investigative techniques authorized and utilized in national security investigations inasmuch as the FBI's
methods for collecting information and the types of techniques it is authorized to use in national security
investigations will, in the context of these records, generally be the same thing.  The FBI cited category (b)(7)(E)-3
in every instance that it cited category (b)(7)(E)-2.

SECRET//NOFORN

SECRET//NOFORN

████████████████████████████████████████

██████████████████████████

(123)   (U)  The release of this information would disclose the methods used in the

collection and analysis of information, including how and from where the FBI collects particular

types of information and the methodologies employed to analyze it once collected.  Such

disclosures would enable subjects of FBI investigations to identify when these or similar

currently used techniques are being used and then take evasive actions or countermeasures to

circumvent them.  This would diminish the relative utility of these techniques and facilitate the

accumulation of information by investigative subjects regarding the circumstances under which

the specific techniques were used or requested and the usefulness of the information obtained.

Accordingly, to protect the viability of these techniques, the FBI protected this information in the

four Page applications and resulting orders, including in the minimization procedures, under

Exemption (b)(7)(E).

(U)  **(b)(7)(E)-3**      **Specific Techniques Authorized for and Used in National Security**
                          **Investigations**

(124)   (U)  The FBI protected information that would reveal the specific techniques that

the FBI is authorized to and in fact uses in national security investigations.  In this context, the

techniques were referenced because they were used in the context of *this* national security

investigation but their disclosure here would also have ramifications for the use of these

techniques in other national security cases.  The FBI has a toolbox of investigative techniques

that it uses in national security (counterintelligence and counterterrorism) cases, which overlap in

many respects with its criminal investigative toolbox, although the FBI obviously has one

significant and different tool in the national security toolbox – FISA.  This category covers non-

44

public information about all of the techniques referenced in the Page FISA applications and

orders including those that have not been publicly disclosed in relation to investigative actions

taken in this investigation; those that have been publicly disclosed in relation to this

investigation, such as CHSs; and those under the FISA that the FISC authorized the FBI to use

here. Although techniques authorized by the FISA are publicly known, this detailed information

about how, when, where, and why such authorities are employed in a particular investigation is

not publicly known.

(125)  (S//NF)  █████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████

(126)  (U)  Here, the context in which these techniques are discussed reveals details

about when in an investigation a particular technique might be utilized, the types of information

that might be sought via the technique, and the limitations on its use and/or utility; what

techniques might be used in combination; and non-public information about how the techniques

are implemented. When aggregated, as it is here, this information can paint a road-map of how a

national security, and in particular a counterintelligence, investigation is conducted.[20]  Disclosure

of such a road-map here and over time would give sophisticated criminals and adversaries the

information necessary to adjust their activities and take effective countermeasures to circumvent

the FBI's investigative and intelligence-gathering efforts.  Accordingly, the FBI protected this

information under Exemption (b)(7)(E) here.

(U)  **(b)(7)(E)-4**      **Specific Databases Used by the FBI for Investigative and Law
                     Enforcement Purposes**

(127)   (U)  The FBI protected its use of several non-public databases that it relied on to

obtain/confirm information and intelligence gathered in the course of its investigation.  These

databases are accessible to law enforcement personnel to conduct queries of or for particular

types of information for law enforcement and intelligence gathering purposes.  The databases

protected include those exclusive to the FBI as well as others that are available to other federal

government law enforcement personnel.  These databases are essentially "one-stop" shops where

the FBI can query already-gathered information in order to corroborate or refute it, and/or obtain

new or additional information in order to develop investigative leads.   It is not publicly known

when and under what circumstances the FBI utilizes these particular databases, particularly in the

context of a national security/counterintelligence investigation.  Armed with such information,

spies, criminals, and others intent on avoiding FBI attention could develop countermeasures to

avoid detection, which would impede the FBI's ability to effectively conduct national security

and criminal investigations.

---

[20] (U) The FISA applications explain the investigative steps taken prior to seeking FISA coverage, as well
as the information that the FBI was able to obtain using them, which formed the probable cause necessary to obtain
a FISA warrant.

SECRET//NOFORN

(U) **(b)(7)(E)-5**     **Monetary Payments in Relation to Utilization of Investigative Techniques**

(128)   (U) The FBI protected specific information about payments to CHSs on two pages of each FISA application. While it is publicly known that the FBI pays CHSs under some circumstances, the details of when, for what, and how much CHSs are paid are aspects of this technique that are not made public, in order to protect the viability of the technique. Without adequate context, the particular amount paid to a CHS could be viewed to suggest the relative volume of information provided by a particular CHS, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's activities.

(129)   (U) Finally, disclosing the amounts paid to CHSs in a particular investigation or for particular types of information would reveal non-public information about the level of resources devoted to particular investigations or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions. Revealing the amount of money the FBI has paid to particular CHSs in particular investigations and over particular periods of time would reveal the FBI's emphasis on certain investigations or intelligence gathering efforts. Revealing this emphasis would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular types of investigations or particular FBI threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence gathering and criminal investigative activities. This would give sophisticated criminals and adversaries the information necessary to

47

SECRET//NOFORN

adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI
strength areas and exploit the weak ones. Accordingly, the FBI protected payment information
under Exemption (b)(7)(E) in this case.

(U) **(b)(7)(E)-6**          **Targets, Dates, and Scope of Surveillance**

(130)  (U)  While it is known that the FBI conducts surveillance authorized under the
FISA, as well as other types of authorized surveillance, and while it is known that there was
surveillance conducted here, the details about how the surveillance was implemented
(investigatively and/or technically), the locations targeted by the surveillance, and the specific
time period(s) during which the surveillance was conducted are not public and were not
disclosed in the HPSCI memoranda.[21] These non-public details about the conduct of
surveillance, particularly surveillance authorized under the FISA, are utilized by the FBI in other
current investigations.  Disclosure of non-public details about when and how the FBI conducts
surveillance and the circumstances under which the FBI will seek authority to do so would, over
time, create a mosaic that criminals and other adversaries could use to predict when and where
surveillance may occur, detect it when it is occurring, and develop and utilize countermeasures to
defeat or avoid different types of surveillances.  Accordingly, the FBI protected this information
under Exemption (b)(7)(E) in the four Page FISA applications and resulting orders, including in
the minimization procedures, in order to preserve the usefulness and utility of this technique.

(U) **(b)(7)(E)-7**          **Dates and Types of Investigations**

(131)  (U)  On one page in each of the FISA applications, the FBI protected information

---

[21] (U)  This includes, for example, the FISC docket numbers, the specific dates that the FISA applications
were filed and orders issued, and the declassification dates in the classification stamps (which can be used to
pinpoint the dates of the applications and orders).  All of this information reveals the specific time period(s) under
which the surveillance was conducted.

SECRET//NOFORN

SECRET//NOFORN

that, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation, and the time period of the particular investigation. Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and the particular dates that the investigation covers, which would allow targets to identify what activities might be under investigation and to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## (U) **(b)(7)(E)-8**     **Investigative Strategies for Utilizing Particular Evidence**

(132)   (U) The FBI protected information, which was repeated in each of the four FISA applications, that describes a particular purpose for which it might use information gathered as a result of its FISA authorized surveillance on Page. This information reflects non-public information about how the FBI investigatively uses information that it gathers during an investigation. While the particular context here concerns information gathered as a result of its utilization of FISA, the same potential uses of investigative information could be present in many other contexts. Publicly disclosing this information would permit targets of FBI investigative activities to anticipate FBI investigative activities, and this in turn would permit them to take countermeasures against such activities. This would abrogate the usefulness of FISA as a technique, at least in this particular and important regard, as well as the investigative activities that may flow as a result of information obtained under FISA. No further information

49

SECRET//NOFORN

about this category of information or how it falls within Exemption (b)(7)(E) can be made on the

public record without undermining the FBI's assertion of this exemption, as well as Exemptions

(b)(1), (b)(3), and (b)(7)(A), which were also asserted to protect this information.

(133)   (S) ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

## (U) SEGREGABILITY DETERMINATIONS FOR RELEASED IN PART PAGES

(134)   (U) Each page of the four Page FISA applications and accompanying orders was

carefully reviewed by a team of DOJ employees to determine what portions of the pages

contained exempt information requiring redaction pursuant to the FOIA, what portions could be

segregated and released, and what pages did not contain any segregable information and had to

be withheld in full. As part of this review, the employees carefully analyzed all information in

the four Page FISA applications and resulting orders to determine what information has been

revealed through the HPSCI memoranda and/or officially, publicly disclosed, and to ensure that

no information for which FOIA exemptions were or likely have been waived was redacted. A

total of 598 pages of responsive records were carefully reviewed and analyzed, and it was

determined that 412 pages could be released in part and that 186 pages had to be withheld in full,

in order to protect the classified and otherwise exempt information contained therein.

## (U) PAGES WITHHELD IN FULL – PAGE FISAs

(135)   (U) The FBI withheld in full 186 pages associated with the FISA applications and

resulting orders pursuant to Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E) (categories 1-3

SECRET//NOFORN

and 6).[22] Disclosure of these pages would reveal classified intelligence methods and law enforcement techniques; however, the FBI cannot publicly describe these pages and the bases for withholding them any further without revealing information that is itself exempt.



(136)  (S//NF)

(137)  (S//NF)

(138)  (S//NF)

---

[22] (U)  Discrete information in the records would be subject to redaction pursuant Exemptions (b)(6) and (b)(7)(C), as described in the category (b)(6)/(b)(7)(C)-2 discussion above.

SECRET//NOFORN



(139)   (S//NF)

(140)   (S//NF)

SECRET//NOFORN

(141)  (S//NF)

## (U) **PARTIAL GLOMAR RESPONSE**

(142)   (U)  The FBI relies on a Glomar response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions.  To be credible and effective, the FBI must use a Glomar response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist.

(143)   (U)  Here, the FBI has determined that merely acknowledging the existence or

53

non-existence of any records responsive to plaintiff's request, beyond the four Carter Page FISA

applications and resulting FISC orders, and former Director Comey's March 20, 2017 statement

that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in

President Trump's March 4, 2017 tweets, could trigger harm under FOIA exemptions.  With

limited exceptions, such as the unique circumstances giving rise to the FBI's processing and

release of the four Page FISA packages, the FBI does not and cannot publicly confirm or deny

FISA coverage on particular individuals or entities, or that FISC orders have been sought or

obtained in the conduct of any particular investigation.  As no authorized Executive Branch

official has acknowledged the existence or non-existence of FISA warrants, applications and

orders beyond the four on Carter Page, the FBI's partial Glomar response as to any other

responsive records remains proper.[23]

(144)  (U)  As an original classification authority, I have determined that the FBI can

neither confirm nor deny whether the FBI maintains responsive records because to do so could

reasonably be expected to compromise national security and/or reveal intelligence activities,

sources, or methods.  *See* 5 U.S.C. §§ 552(b)(1), (b)(3).

---

[23]  (U)  On March 20, 2017, then FBI Director James B. Comey specifically addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama had had President Trump's " 'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI.  The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components.  The Department has no information that supports those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017.  https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last accessed 6/12/2017).  Aside from this statement and the acknowledgment of the four Page FISA applications and accompanying FISC orders, neither the FBI not DOJ have publicly commented on or acknowledged the existence or non-existence of any other FISA records within the scope of plaintiff's FOIA request.

(145) (U) Moreover, acknowledging or denying the existence or non-existence of records could result in harms protected against by FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A).

    A.    (U) As previously described, on March 20, 2017, then-FBI Director Comey publicly confirmed the existence of an investigation into Russia's interference in the 2016 Presidential election. *See* Statement Before the House Permanent Select Committee on Intelligence, available at <u>https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation</u>). On May 17, 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the investigation confirmed by then-FBI Director Comey on March 20, 2017. DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)).

    B.    (U) As plaintiff specifically requested FISA/FISC records related to Russian interference in the 2016 election, the FBI cannot confirm or deny the existence or non-existence of responsive records, beyond those already acknowledged and processed, because that could reasonably be expected to adversely affect the pending investigation.

(146) (U) Finally, acknowledging the existence or non-existence of any other responsive records could reasonably be expected to risk circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E).

    (U) **FOIA EXEMPTION (b)(1) AS A BASIS FOR THE PARTIAL GLOMAR RESPONSE**

(147) (U) FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national

SECRET//NOFORN

defense or foreign policy and (B) are in fact properly classified pursuant to such Executive

order." 5 U.S.C. § 552(b)(1).

(148)   (U)  E.O. 13526 § 1.1(a) provides that information may be originally classified

under the terms of this order only if all of the following conditions are met: (1) an original

classification authority is classifying the information; (2) the information is owned by, produced

by or for, or is under the control of the U.S. Government; (3) the information falls within one or

more of the categories of information listed in § 1.4 of E.O. 13526; and (4) the original

classification authority determines that the unauthorized disclosure of the information reasonably

could be expected to result in some level of damage to the national security, and the original

classification authority is able to identify or describe the damage.

(149)   (U)  E.O. 13526 explicitly authorizes precisely the type of response that the FBI

has provided to plaintiff in this case.  Specifically, § 3.6(a) provides that "[a]n agency may refuse

to confirm or deny the existence or nonexistence of requested records whenever the fact of their

existence or nonexistence is itself classified under this order or its predecessors."

(150)   (U)  Consistent with E.O. 13526 and as described below, I have determined that

acknowledging the existence or nonexistence of the records requested by plaintiff, beyond the

four Carter Page FISA applications and orders discussed in detail above, would require the FBI

to disclose properly classified facts that concern § 1.4(c) ("intelligence activities, sources, and

methods") and § 1.4(d) ("foreign relations and foreign activities of the United States").

Moreover, responsive records, if they exist, would be owned by and under the control of the U.S.

Government.  Finally, I have determined that acknowledging the existence or non-existence of

the requested records reasonably could be expected to result in damage to national security.

SECRET//NOFORN

(151)  (U)  My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.[24]

### (U) *Intelligence Activities, Sources, and Methods*

(152)  (U)  The records requested by plaintiffs, if they exist, implicate classified intelligence activities and methods, and acknowledging the existence or non-existence of any such records reasonably can be expected to cause damage to national security.  An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.  An intelligence activity or method has two characteristics.  First, the intelligence activity or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(153)  (U)  Intelligence activities and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific

---

[24] (U)  To the extent possible on the public record, I have explained the harm to national security that would result from confirming or denying the existence or non-existence responsive records here.  If the Court finds that explanation inadequate, Defendants could offer further explanation *ex parte* and *in camera.*

use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(154)  (U) The U.S. Government must do more than prevent explicit references to an intelligence activity or method; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(155)  (U) Here, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and resulting FISC orders, and former Director Comey's March 20, 2017 statement that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in President Trump's March 4, 2017 tweets, would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations. The FBI has not confirmed or denied the existence of any other FISA surveillance records responsive to plaintiff's request. Confirming or denying whether any or not other responsive records exist would reveal otherwise non-public information regarding the nature of the FBI's intelligence

58

interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission. Accordingly, to confirm or deny that the FBI possesses or does not possess records responsive to plaintiff's request could risk compromising intelligence activities or methods, and thus would pose at least a serious risk to the national security.[25]

### (U) *Foreign Relations and Foreign Activities of the United States*

(156)  (U)  Responding to plaintiff's request with anything other than a Glomar response would also reveal information concerning U.S. foreign relations and foreign activities, the disclosure of which reasonably can be expected to cause damage to national security. Plaintiff's request necessarily implicates U.S. foreign relations and foreign activities in relation to foreign governments or government officials/employees.

(157)  (U)  FISA prescribes procedures for the physical and electronic surveillance and collection of "foreign intelligence information" between "foreign powers" and "agents of foreign powers" suspected of espionage or terrorism. Thus, on its face, a request for information about FISA materials implicates foreign relations and foreign activities because those are at the heart of the FBI's use of FISA as an intelligence and investigative tool.

(158)  (U)  The FBI's confirmation or denial of the existence of responsive records could reasonably be expected to cause damage to the national security interests of the United States by negatively impacting U.S. foreign relations with these and other countries. Given the sensitivity of the United States' present and future relationships with foreign countries and the importance of such relationships to our national security, requests like plaintiff's—which, directly or

---

[25] (U) FISC orders, applications, and minimization procedures are classified, at a minimum, at the SECRET level.

indirectly, call for records that would relate to sensitive and appropriately classified details of the United States' relationship with foreign government(s)—reflect precisely the situation in which the FBI finds it necessary to assert a partial Glomar response to plaintiff's request.

(159)  (S//NF) 

(160)  (U) Accordingly, confirming or denying the existence or non-existence of particular FISA records can reasonably be expected to cause serious damage to the national security by undermining our relationships with foreign partners.

### (U) FOIA EXEMPTION (b)(3) AS A BASIS FOR THE PARTIAL GLOMAR RESPONSE

(161)   (U)   Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld.  5 U.S.C. § 552(b)(3)(A).  If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it must specifically cite this paragraph in order for Exemption (b)(3) to apply.  *Id.* at § 552(b)(3)(B).

(162)   (U)   Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1 (i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."  Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" under 5 U.S.C. § 552(b)(3).  Under the direction of the DNI, other components within the U.S. Government are authorized to protect intelligence sources and methods from unauthorized disclosure.

(163)   (U)   As previously described in relation to the Exemption (b)(1) Glomar explanation, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, would tend to reveal whether an intelligence method[26] is being deployed against a particular

---

[26]  (U) An intelligence method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest; any procedure (human or non-human) or intelligence source, used to obtain information concerning the individual or organization; and foreign liaison relationships.

SECRET//NOFORN

target or organization, thus compromising the national security interests of the United States. Accordingly, the National Security Act, in conjunction with Exemption (b)(3), provides an additional and independent basis for the FBI's partial Glomar response to plaintiff's request.

### (U) FOIA EXEMPTIONS (b)(7)(A) AND (b)(7)(E) AS BASES FOR THE GLOMAR RESPONSE

#### (U) *Exemption (b)(7) Threshold*

(164)  (U)  As discussed above, before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(165)  (U)  The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities.  Accordingly, FISA applications and FISC orders – when they exist – are records compiled for law enforcement purposes.

#### (U) *Exemption (b)(7)(A)*

(166)  (U)  FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(167)  (U)  In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

SECRET//NOFORN

(168)  (U)  As previously noted, in July 2016, the FBI opened an investigation of Russian election interference.  The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation.  The FBI thereafter sought and obtained three renewals from the FISC to continue surveilling Page.  The FISA applications were compiled as part of the investigation into Russian election interference.  In May 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the Russian election interference investigation confirmed by then-FBI Director James Comey on March 20, 2017.  That investigation is on-going.  Plaintiff's request specifically seeks FISA applications and FISC orders related to the Russian election interference investigation.  Thus, the requirement of a pending enforcement proceeding in Exemption (b)(7)(A) is satisfied.

(169)  (U)  The final element -- interference with that investigation -- is readily established.  Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation.  Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  Prematurely disclosing non-public information about the Russia investigation could give targets and others intent on interfering with the FBI's investigative efforts the information necessary to:  take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.  Accordingly, confirming or denying the existence or non-existence of responsive records, beyond the four Carter Page FISA applications and orders discussed in detail above, could reasonably be expected to adversely

affect the pending investigation. Therefore, the FBI's partial Glomar response is justified under Exemption (b)(7)(A) as well.

### (U) *Exemption (b)(7)(E)*

(170)  (U)  Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E).  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(171)  (U)  How the FBI applies its investigative resources (or not) against a particular allegation, report of criminal activity, or perceived threat is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E).

(172)  (U)  As previously demonstrated, acknowledging or denying the existence or non-existence of the law enforcement records that plaintiff seeks, beyond the four Carter Page FISA applications and orders discussed in detail above, would be tantamount to confirming or denying whether or not the FBI is employing specific investigative techniques authorized under the FISA against specific targets as part of the pending Russian interference investigation.  Even in acknowledged investigations, the FBI does not routinely disclose whether or not it has employed this particular classified investigative technique against a particular target.  Such an acknowledgment would reveal when and under what circumstances the FBI relies upon FISA-authorized techniques in an investigation.   Confirming whether or not FBI has responsive

64

SECRET//NOFORN

records would provide pieces of information that adversaries could use to ascertain at what point, and against whom we might use particular techniques. Armed with this information, adversaries could glean significant insight into the activities likely to attract – or not attract – the FBI's law enforcement attention. These individuals would then be able alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing threats and investigating crimes. Therefore, the FBI can neither confirm nor deny the existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, without causing harms protected against by FOIA Exemption (b)(7)(E), and Exemption (b)(7)(E) provides independent justification for the FBI's partial Glomar response here.

## (U) **CONCLUSION**

(173)   (U)  For the reasons described above, the FBI's Glomar response to plaintiff's request, except as to records that have been officially publicly revealed, was proper; the FBI's search for records responsive to the portion of plaintiff's request for which the Glomar response has been pierced – *i.e.*, the four FISA applications and orders on Carter Page revealed in the HPSCI memoranda – was reasonably calculated to, and in fact did, locate the responsive records; the FBI properly protected information in the four Page FISA applications and orders pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), and (b)(7)(A) and (C)-(E); and the FBI reasonably segregated and released non-exempt information on the pages released in part and properly concluded that it could not do so on the pages withheld in full.

SECRET//NOFORN

SECRET//NOFORN

(U)  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct, and that Exhibits A and B attached hereto are true and correct copies.

(U)  Executed this ___ day of October, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

SECRET//NOFORN